IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRYAN MESSENGER, | ) |
| Plaintiff, | ) Case No.: |
| v. | ) |
| NATIONAL BOARD OF MEDICAL DEMANDED EXAMINERS, | ) JURY TRIAL |
| Defendant. | ) |

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Plaintiff Bryan Messenger has dyslexia and seeks double time as a testing accommodation on the United States Medical Licensing Examination Step 2 CK (USMLE Step 2 CK), a test administered by Defendant National Board of Medical Examiners (NBME). Messenger must pass the USMLE Step 2 CK to obtain a medical license and competitively apply for residency programs.  The double time that Messenger seeks is the same accommodation that Messenger received for examinations in medical school on the basis of extensive testing and documentation.

Despite NBME's history of providing double time as a testing accommodation and Dr. Messenger's well-documented need for such double time, NMBE has refused his requests for this accommodation.  As a result, Dr. Messenger has been unable to obtain scores that accurately

measure his ability rather than his disability and his dream of becoming a pediatrician has been put on hold indefinitely.  Dr. Messenger moves for preliminary injunctive relief so that he can take the test with accommodations by July 15, 2017, in time for him to submit a competitive application for summer 2018 residency programs.

## STATEMENT OF FACTS

Dr. Messenger has long planned to become a pediatrician.  (Ex. 1, Messenger Decl. ¶ 4). Dr. Messenger has dyslexia and has always experienced difficulty reading.  (*Id.* at ¶ 6).  He did not learn to read until second grade.  (*Id.*)  When his grade school teacher noticed his problems with reading, Dr. Messenger was tested and determined to have a learning disability.  (*Id.* at ¶ 7). He had an Individual Education Program (IEP) in place from second grade through tenth grade for the purpose of improving his reading fluency and speed.  (*Id.*)  From elementary school through college, Dr. Messenger regularly took two to three times longer than his peers to read assignments and write papers.  (*Id.* at ¶ 8).

Dyslexia makes it difficult to read, write, and comprehend written language with accuracy and fluency.  Dr. Messenger's ability to read and understand information is extremely slow.  Dyslexia affects Dr. Messenger's daily life.  He has difficulty following maps and driving directions.  He also has difficulty using grocery lists and frequently returns home with incorrect items.  Dr. Messenger skips steps in recipes and sometimes includes wrong ingredients or leaves something out.  His two oldest children are in first and third grades.  They already read better than he does.  It takes Dr. Messenger four times as long as his wife to read an email or letter.  His wife often helps him read and write emails, especially when he needs to respond quickly.  (*Id.* at ¶¶ 9, 10).  During examinations, he takes longer to process the questions.  This is the case even

though he has studied and knows the information being tested.  He also experiences fatigue during tests.  (*Id.* at ¶ 10).

In December 2011, Dr. Messenger was re-evaluated by an expert and was again diagnosed with a reading disorder.  The expert concluded that Dr. Messenger needs additional time on tests.  (*Id.* at ¶ 11).  Dr. Messenger received extra time on tests while in medical school at St. George's University.  (*Id.* at ¶ 12).  With this necessary testing accommodation, Dr. Messenger successfully completed medical school.  He received his M.D. degree in April 2017.  (*Id.*).

In September 2015, Dr. Messenger took the USMLE Step 2 CK without testing accommodations and failed the exam. (*Id.* at ¶ 13).  Because he did not have enough time to complete the exam, the test measured his disability rather than his ability.  He requested testing accommodations before attempting the exam again.  Because NBME requires disability documentation no more than three years prior to a request for accommodation, Dr. Messenger underwent an additional evaluation by Lisa P. Kestler, Ph. D., of The Dyslexia of Princeton in Princeton, New Jersey.  (*Id*. at ¶¶ 13-14).  Dr. Kestler confirmed Dr. Messenger's diagnosis of dyslexia and concluded that he needs double time for tests.  (Ex. 2, Kestler Decl. at ¶¶ 9-11, 16).

Dr. Kestler found that Dr. Messenger has dyseidetic dyslexia and dysphonetic dyslexia.[1] (*Id.* at ¶ 11).  His pattern of decoding and encoding written language indicates significant difficulty perceiving and remembering whole words, as well as significant difficulty integrating symbols and sounds to use rules of phonics for reading and spelling.  (*Id.*).  Dr. Messenger's

---

[1] Dyseidetic dyslexia is a reduced ability to perceive whole words for instantaneous reading and spelling, despite the word having been seen on repeated occasions.  Dysphonetic dyslexia is a reduced ability to integrate symbols and sounds, resulting in difficulty developing and using word attack skills to decode single, unknown words.  (*Id.* ¶ 11 n.1).

general cognitive ability is in the superior range, with a full-scale IQ of 126.  In contrast, however, he demonstrated clinically significant weakness in basic reading skills, and he also demonstrated poor spelling, sentence composition, and grammar and mechanics in composing essays.  His level of oral reading fluency is equivalent to that of an average 4th grade-4th month student (based on Gray Oral Reading Test).  (*Id.* at ¶ 12).[2]  Dr. Messenger's current reading comprehension and fluency skills are over 2½ standard deviations below his general ability level.  His scores for written expression are nearly 2 standard deviations below.  Dr. Kestler concluded that Dr. Messenger meets criteria for Specific Learning Disabilities in Reading and Written Expression.  (*Id.* at ¶ 15).

Dr. Kestler's professional opinion, based upon her expertise and significant testing of Dr. Messenger, is that, due to his dyslexia, Dr. Messenger needs double time to complete tests, including but not limited to the USMLE Step 2 CK.  His level of fluency in reading and writing are below the level that he can demonstrate his knowledge without additional time.  Absent double time on the USMLE Step 2 CK, Dr. Messenger will not be able to demonstrate his knowledge of medicine.  (*Id.* at ¶¶ 16-17).

On November 16, 2015, Dr. Messenger submitted an application for testing accommodations to the NBME.  He requested extra time on USMLE Step 2 CK. (Ex. 1, Messenger Decl. ¶ 15).  He submitted Dr. Kestler's report along with the 2011 report diagnosing him with a reading disability and recommending extra time and documentation from his medical school indicating that it gives him double time on examinations.  On March 3, 2016, NMBE denied his request.  (*Id.* at ¶ 16).  Subsequently, on May 31, 2016, Dr. Messenger

---

[2] Dr. Kestler also reviewed the results of testing administered to Dr. Messenger during elementary school.  She concluded that those test results also support a diagnosis of dyslexia and demonstrate that Dr. Messenger has had this disability since childhood.  (*Id.* at ¶ 14).

was forced to take the USMLE Step 2 CK without accommodations. The lack of testing accommodations meant that the test measured the extent of his dyslexia rather than the extent of his knowledge of medicine, and he again failed the exam.

In November 2016, Dr. Messenger renewed his request to Defendant for double time on the USMLE Step 2 CK exam. (*Id.* at ¶ 18). In a letter dated December 9, 2016, Defendant again denied Dr. Messenger's request for testing accommodations. (*Id.* at ¶ 19). To date, Dr. Messenger has not taken the USMLE Step 2 CK again given NBME's refusal to accommodate his disability. (*Id.* at ¶ 20).

Dr. Messenger received his M.D. degree in April 2017. (*Id.* at ¶ 5). However, passing the USMLE Step 2 CK is a prerequisite for his acceptance to residency programs. As a result of NMBE's refusals to accommodate his disability and his resulting failing results on USMLE Step 2 CK, Dr. Messenger was unable to obtain 2016 or 2017 residency placements. (*Id.* at ¶ 24). In order to competitively apply for 2018 residency programs, he must take the USMLE Step 2 CK by July 15, 2017. (*Id.* at ¶ 25). The more time that passes between Dr. Messenger's completion of his clinical rotations and his participation in residency, the greater the likelihood that Dr. Messenger will not be accepted into a residency program because he will have missed the opportunity to timely put into practice the knowledge and skills he learned during medical school. (*Id.* at ¶ 26). Because Dr. Messenger must complete a residency program in order to become a pediatrician, his career and ability to care for his family are in significant and immediate jeopardy. (*Id.* at ¶¶ 27-28).

Extended time is an accommodation that the NMBE routinely offers for test-takers. National Board of Medical Examiners, Test Accommodations, *available at* http://www.nbme.org/students/accomodations.html (last accessed May 25, 2017). NMBE also

entered into into a settlement agreement with the U.S. Department of Justice (DOJ) in February 2011 after it refused to provide testing accommodations to a dyslexic student at Yale Medical School. Justice Department Settles with National Board of Medical Examiners over Refusal to Provide Testing Accommodations to Yale Medical School Student, *available at* https://www.justice.gov/opa/pr/justice-department-settles-national-board-medical-examiners-over-refusalto-provide-testing (last accessed May 25, 2017). As a result of the settlement, NBME committed to "providing reasonable testing accommodations to persons with disabilities who seek to take the USMLE, in accordance with the requirements of the ADA." *Id.*

## ARGUMENT

**A. Plaintiff Meets the Standards for a Preliminary Injunction.**

Four factors govern a district court's decision whether to issue a preliminary injunction: "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief requested; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1477 n.2 (3d Cir.1996) (en banc). As established below, Plaintiff easily meets these requirements for obtaining a preliminary injunction.

**1. Plaintiff Is Likely to Succeed on the Merits.**

Title III of the Americans with Disabilities Act prohibits discrimination on the basis of disability. An individual has a disability if he or she is substantially limited in a major life activity. 42 U.S.C. § 12102. The Department of Justice has explained that "[t]he term

'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 28 C.F.R. § 36.105.  Courts regularly construe dyslexia as a disability that substantially limits the major life activities of reading, learning, and concentrating.  *See, e.g.*, *Vinson v. Thomas*, 288 F.3d 1145, 1153-54 (9th Cir. 2001); *Karlik v. Colvin,* 15 F. Supp. 3d 700, 707 (E.D. Mich. 2014) (collecting cases).

Title III of the Americans with Disabilities Act (ADA) requires that testing providers, including the NBME, "offer such examinations . . . in a place and *manner* accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189 (emphasis added).[3]  The U.S. Department of Justice regulations interpret this provision of the ADA to require that

> "[t]he examination is selected and administered so as to *best ensure* that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure)."

28 C.F.R. § 36.309(b)(1)(i) (emphasis added); *Rawdin v. American Bd. of Pediatrics*, 582 F. App'x 114, 118 n.9 (3d Cir. 2014) (quoting regulation).

When considering what accommodations are necessary for the test to "best ensure" that the test measures the applicant's ability rather than his or her disability, the testing entity must give

---

[3] The ADA and Rehabilitation Act contain analogous requirements and this brief analyzes the claims together.  *See, e.g.*, *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998).  The New Jersey Law Against Discrimination is at least as protective as the federal statutes.  *Jones v. Aluminum Shapes,* 772 A.2d 34, 40 (N.J. Sup. Ct. App. Div. 2001) (holding that "it is well-settled law in New Jersey that our state courts, in interpreting the LAD, should look to federal anti-discrimination cases as a key source of interpretive authority.").  Accordingly, the remainder of this discussion will focus on the ADA.

7

> "considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations, as well as such modifications, accommodations, or related aids and services provided in response to an Individualized Education Program (IEP) provided under the Individuals with Disabilities Education Act or a plan describing services provided pursuant to section 504 of the Rehabilitation Act of 1973, as amended (often referred to as a Section 504 Plan)."

28 C.F.R. § 36.309(b)(1)(v).  The regulations further state that "[a]ny request for documentation, if such documentation is required, is reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested." *Id.* § 36.309(b)(1)(iv).  Finally, the regulations state explicitly that "[r]equired modifications to an examination may include changes *in the length of time permitted for completion of the examination* and adaptation of the manner in which the examination is given."  *Id.* § 36.309(b)(2) (emphasis added).

Courts analyzing the regulation have made clear that testing entities must provide the testing accommodations "so as to best ensure" that the results reflect whatever skill or aptitude the exam purports to measure.  *Enyart v. Nat'l Conference of Bar Examin'rs, Inc.*, 630 F.3d 1153, 1162 (9th Cir. 2011) (quoting 28 C.F.R. § 36.309).  This "best ensures" standard is distinct from and a higher standard than the "reasonable accommodation" standard used in the employment discrimination context.  *Id.*; *see also Rawdin*, 582 F. App'x at 118 n.7 (following *Enyart*).

Courts give considerable weight to expert evaluations of the person with a disability and his or her prior history of accommodations.  For instance, in *D'Amico v. New York State Board of Law Examiners*, 813 F. Supp. 217 (W.D.N.Y. 1993), the Court granted a preliminary injunction, taking the view that the opinion of the plaintiff's physician must be given great weight and that the absence of a medical expert reviewing on behalf of the testing agency left it in "no position to countermand . . . as to what is the appropriate accommodation."  *Id.* at 222.

8

*See also, e.g.*, *Agranoff v. Law Sch. Admission Council, Inc.*, 97 F. Supp. 2d 86, 87 (D. Mass. 1999).

Here, Dr. Messenger can readily establish that he is an individual with a disability because dyslexia is significantly limits the ability to read, learn, concentrate, think, and process information, as shown by the basis of extensive testing demonstrating that even though he graduated from medical school, he has the reading comprehension of a fourth-grader.  His dyslexia interferes with his everyday life activities including following driving directions, using recipes to prepare meals for his family, and reading and composing emails.  He has difficulty even reading books to his children who are in elementary school.  As discussed above, courts routinely recognize that individuals with Dr. Messenger's level of reading difficulties due to his dyslexia are individuals with a disability.

Further, such documentation of Dr. Messenger's dyslexia dates back to second grade.  He has continually received expert evaluations diagnosing him with dyslexia and recommending that he be given extra time on exams.  Deference must be given to the opinions of these evaluators particularly since NBME has produced no evaluation of its own.  28 C.F.R. § 36.309(b)(1)(v); *Agranoff*, 97 F. Supp. 2d at 87; *D'Amico*, 813 F. Supp. at 222.  NBME has ignored not only this extensive documentation of Dr. Messenger's disability but also his history of receiving double time in medical school.  In fact, NBME has offered no explanation whatsoever for disregarding the substantial body of evidence that Dr. Messenger submitted documenting his disability and history of receiving testing accommodations.

Since Dr. Messenger can readily establish that he is an individual with a disability substantially limited in the major life activities of reading, learning, and concentrating, he will be able to establish that double time is a necessary reasonable modification for NBME to "best

ensure" that the Step 2 CK fairly measures his medical knowledge. 28 C.F.R. § 36.309(b)(1)(i); *Enyart*, 630 F.3d at 1162. When he has taken the testing without accommodations, he has been unable to complete blocks of questions and been forced to guess to finish the test. In addition, he has experienced fatigue and anxiety. For the reasons Dr. Kestler described in her expert evaluation of Dr. Messenger, extra time is necessary to ensure that the test measures his abilities rather than the extent of his dyslexia.

For these reasons, Dr. Messenger is likely to prevail on the merits of his claims.

**2. Dr. Messenger will Suffer Irreparable Harm if the Injunction Is Not Granted.**

Courts have presumed irreparable harm when there was a violation of the ADA, since the statute's goals "include assuring that all individuals with disabilities enjoy 'equality of opportunity, full participation, independent living, and economic self-sufficiency.'" *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997) (quoting 42 U.S.C. § 12101). Consequently, "[i]njuries to individual dignity and deprivations of civil rights constitute irreparable injury." *Id.*; *see also, e.g.*, *Burriola v. Greater Toledo YMCA*, 133 F. Supp. 2d 1034, 1040 (N.D. Ohio 2001) (holding that there is irreparable harm when a person is discriminated against on the basis of disability).

Courts also view as irreparable injury a person's psychological harm in not being able to pursue his chosen profession. In *Enyart v. Nat'l Conference of Bar Examin'rs*, the Ninth Circuit affirmed the grant of a preliminary injunction requiring bar exam administrators to provide accommodations for a blind test-taker, explaining that he had "demonstrated irreparable harm in the form of the loss of opportunity to pursue her chosen profession." *Id.* at 1165.

Just as Enyart wanted to become a lawyer, Dr. Messenger wants to become a pediatrician. Each day that Dr. Messenger has to defer his dream is a day that he suffers the sort

10

of emotional and dignitary harm that the ADA was enacted to prevent. Dr. Messenger has already lost two years as a result of NMBE's refusal to provide testing accommodations, and with the passing of each year, he becomes increasingly less likely to obtain the residency necessary to become a pediatrician. In addition, delay in pursuing a residency decreases the likelihood of obtaining a pediatric residency; he is at increasing risk that he will never become a pediatrician. In addition, Dr. Messenger has been unable to find significant work opportunities and faces crushing student loan debt. His future and ability to care for his family are in jeopardy. Since this is precisely the sort of injury that courts have held to be irreparable harm, Dr. Messenger satisfies the requirement for irreparable harm.

### 3. Balance of Hardships.

NMBE routinely grants double-time on examinations. *See, e.g.*, *Doe v. Nat'l Bd. of Medical Exam'ners*, 199 F.3d 146, 150 (3d Cir. 1999) (stating that NMBE provided double-time for test applicant even though he requested only time and a half); *Mahmood v. Nat'l Board of Medical Exam'ners*, Civ. A. No. 12-1544, 2013 U.S. Dist. LEXIS 19811, at *8-*9 (E.D. Pa. Feb. 14, 2013) (noting that the NBME has granted double time). NMBE will suffer no harm if it grants Dr. Messenger double time on his examination, in accordance with its policy of providing extra time for students with disabilities and settlement agreement it entered into with the Department of Justice committing to providing such accommodations.

Whereas NBME will suffer no harm if it grants him double time, Dr. Messenger has had to put his career on hold, and, will continue to do so. For as long as NMBE refuses to provide him the necessary testing accommodations, he will not be able to apply for the necessary pediatric residencies to become a pediatrician. For these reasons, NMBE's refusal to grant a

routine accommodation is outweighed by the significant harm that Dr. Messenger would experience in having to postpone indefinitely his dream of becoming a pediatrician.

**4. Granting the Preliminary Injunction Will Advance the Public Interest.**

Congress has made clear in enacting the ADA that the public interest lies in the eradication of discrimination against persons with disabilities, declaring that the ADA's purpose is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 516 (2004) (citations omitted). Furthermore, the ADA is intended to address the various forms of discrimination encountered by individuals with disabilities including "the failure to make modifications to existing facilities and practices" and "exclusionary qualification standards and criteria." 42 U.S.C. §12101(a)(5). In the context of testing accommodations, Congress explained that it enacted 42 U.S.C. § 12189 "to assure that persons with disabilities are not foreclosed from educational, professional or trade opportunities because an examination or course is conducted in an inaccessible site or without an accommodation." *Rawdin*, 582 F. App'x at 118 (quoting H.R. Rep. No. 101-485(III), at 68-69 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 491-92). For these reasons, granting a preliminary injunction would further the public interest in eradicating discrimination against individuals with a disability.

**B. Plaintiff Should Not Be Required to Post a Bond.**

In cases such as this, it is appropriate for the court to waive the requirement that Plaintiff post a bond. *See Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991). In *Temple,* the Third Circuit held that a court should weigh the potential loss to the enjoined party against the hardship that a bond requirement would impose on the applicant. *Id.* at 219. The Third Circuit further

explained that the district court should consider whether the applicant seeks to enforce a significant federal right or matter of public interest.  *Id.* at 220.

Applying the *Temple* factors to this case, it is clearly appropriate for this Court to waive the bond requirement for Dr. Messenger.  Extra time is a routine testing accommodation that would cost NBME little, if anything, to provide.  Plaintiff has been unable to find significant work given the career limbo that he is in, and he faces crushing student debt as a result of the medical school tuition he incurred in pursuing his dream of becoming a pediatrician.  He must support a family of four children and cannot afford to pay a significant bond.  In this instance, setting a bond would have the practical effect of denying Dr. Messenger the opportunity to take the exam with accommodations.  Further, the second *Temple* factor counsels strongly against imposing a bond, as Dr. Messenger seeks to vindicate his civil rights as an individual with a disability protected by federal and state anti-discrimination laws.

## CONCLUSION

For the reasons stated above, this Court should enter an order for a preliminary injunction before June 30, 2017, that requires Defendant to permit Dr. Messenger to take the USMLE Step 2 CK with double time so that he has an opportunity to take the test in advance of the application cycle for pediatric residencies.  Entry of an injunction by June 30, 2017 will enable Dr. Messenger to take this exam by July 15, 2017 and receive his results back in time to competitively apply for a residency on September 15, 2017.

Dated: May 26, 2017                                Respectfully submitted,

<u>s/Clara R. Smit</u>
Clara R. Smit, NJ Bar No. 060086
Law Office of Clara R. Smit
100 Horizon Center Boulevard
Hamilton, New Jersey 08691
Phone: (732) 843-6600
Fax: (877) 617-3494
crsmitlaw@aol.com

<u>s/Martha M. Lafferty</u>
Mary M. Vargas*
Michael Steven Stein*
Martha M. Lafferty*
Stein & Vargas, LLP
840 First Street NE, Third Floor
Washington, DC 20002
Phone (202) 248-5092
Facsimile (888) 778-4620
michael.stein@steinvargas.com
mary.vargas@steinvargas.com
martie.lafferty@steinvargas.com

*Motions to participate pro hac vice to be submitted after case opened