**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BRYAN MESSENGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:17-cv-03755-FLW-DEA |
| | ) |
| NATIONAL BOARD OF MEDICAL | ) Motion Day:  June 19, 2017 |
| EXAMINERS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT NBME'S MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Felice Galant
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
Telephone:  (212) 318-3000
Facsimile:  (212) 318-3400
felice.galant@nortonrosefulbright.com

Robert A. Burgoyne
  (*pro hac* application forthcoming)
Caroline M. Mew
  (*pro hac* application forthcoming)
Norton Rose Fulbright US LLP
799 9th Street, NW, Suite 1000
Washington, D.C.  20001
Telephone:  (202) 662-0200
Facsimile:  (202) 662-4643

June 5, 2017

Attorneys for Defendant National Board of
Medical Examiners

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

NATURE OF THE CASE ...................................................................................... 3

BACKGROUND .................................................................................................... 5

    I.    NBME And The United States Medical Licensing Examination .......................... 5

    II.    Dr. Messenger's Request for Accommodations on the USMLE Step 2 CK Exam .................................................................................................................. 6

    III.    Dr. Messenger's Academic History and History Taking Other National Standardized Tests ............................................................................................ 8

        A.    Academic History ........................................................................................ 8

            1.    Primary and Secondary School .................................................... 8

            2.    College ...................................................................................... 10

    IV.    Dr. Messenger's Claimed Impairment .............................................................. 11

        A.    Dr. Martinelli's Evaluation ...................................................................... 11

        B.    Dr. Kestler's Re-Evaluation .................................................................... 13

ARGUMENT ...................................................................................................... 16

    I.    Preliminary Injunction Standard ...................................................................... 16

    II.    Dr. Messenger is Not Likely to Succeed on the Merits ...................................... 16

        A.    Disability Under The ADA:  Substantial Limitation in a Major Life Activity Compared to Most People in the General Population ................ 17

        B.    Dr. Messenger is Not Likely to Succeed in Showing That He is Disabled Within the Meaning of the ADA. ............................................... 19

    III.    Dr. Messenger Has Not Made a Clear Showing that He is Likely to Suffer Irreparable Harm ............................................................................................ 25

    IV.    Any Claimed Harm to Dr. Messenger Does Not Outweigh the Harm to NBME If An Injunction Issues ......................................................................... 27

    V.    An Injunction Does Not Serve the Public Interest .............................................. 28

CONCLUSION .................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000)...................................................................26

*Alston v. Park Pleasant, Inc.*,
2017 U.S. App. LEXIS 2668 (3d Cir. 2017) .........................................18

*B.C. v. Mt. Vernon School Dist.*,
837 F.3d 152 (2d Cir. 2016).....................................................................8

*Bach v. Law School Admission Council*,
2014 U.S. Dist. LEXIS 124632 (M.D.N.C. 2014)..........................24, 28

*Baer v. NBME*,
392 F. Supp. 2d 42 (D. Mass. 2005) ......................................................27

*Bennington Foods LLC v. St. Croix Renaissance Group, LLP*,
528 F.3d 176 (3d Cir 2008)....................................................................16

*Bercovitch v. Baldwin Sch.*,
133 F.3d 141 (1st Cir. 1998)...................................................................24

*Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*,
2016 U.S. Dist. LEXIS 48181 (E.D. Pa. 2016) ................20, 21, 24, 25

*Bowers v. NCAA*,
118 F. Supp. 2d 494 (D.N.J. 2000) ..........................................................4

*Chaves v. Int'l Boxing Fed'n*,
2016 U.S. Dist. LEXIS 37158 (D.N.J. 2016) ........................................26

*Citibank, N.A. v. Citytrust*,
756 F.2d 273 (3d Cir. 1985)...................................................................26

*Cox v. City of Chicago*,
868 F.2d 217 (7th Cir. 1989) .................................................................26

*Doe v. Nat'l Bd. of Med. Examiners*,
199 F.3d 146 (3d Cir. 1999).....................................................................6

*Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*,
870 F. Supp. 2d 607 (S.D. Ind. 2012) ..............................................21, 24

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004)............................................................................16

*Lincoln CERCPAC v. Health & Hospitals Corp.*,
   920 F. Supp. 488 (S.D.N.Y. 1996)................................................................25

*Love v. Law School Admission Council*,
   513 F. Supp. 2d 206 (E.D. Pa. 2007) .......................................................21, 24

*Mahmood v. Nat'l Bd. of Med. Examiners*,
   2012 U.S. Dist. LEXIS 86837 (E.D. Pa. 2012) ........................................26, 28

*Mann v. Louisiana High Sch. Athletic Assoc.*,
   535 Fed. Appx. 405 (5th Cir. 2013)..............................................................18

*Neely v. PSEG Texas, LP*,
   735 F.3d 242 (5th Cir. 2013) ........................................................................17

*O'Brien v. Virginia Bd. of Bar Examiners*,
   1998 U.S. Dist. LEXIS 4344 (E.D. Va. 1998)..............................................26

*Palotai v. Univ. of Maryland*,
   38 Fed. Appx. 946 (4th Cir. 2002).................................................................24

*Pazer v. N.Y. Bd. of Law Examiners*,
   849 F. Supp. 284 (S.D.N.Y. 1994).................................................................27

*Petit-Clair v. State of New Jersey*,
   2015 U.S. Dist. LEXIS 101624 (D.N.J. 2015) ..............................................16

*Powell v. Nat'l Bd. of Med. Exam'rs*,
   364 F.3d 79 (2d Cir. 2004)..........................................................................6, 28

*Rawdin v. Amer. Bd. of Pediatrics*,
   985 F. Supp. 2d 636 (E.D. Pa. 2013) ........................................................20, 25

*Rumbin v. Ass'n of American Med. Colleges*,
   803 F. Supp. 2d 83 (D. Ct. 2011)..................................................................24

*Singh v. George Washington Univ.*,
   508 F.3d 1097 (D.C. Cir. 2007).....................................................................20

*Ware v. Wyoming Bd. of Law Exam'rs*,
   973 F. Supp. 1339 (D. Wyo. 1997)................................................................22

*Winter v. Nat'l Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).........................................................................................16

**Statutes**

29 U.S.C. § 794 ..................................................................................................................4

42 U.S.C. § 12102(1)(A) ..............................................................................................4, 17, 19

42 U.S.C. § 12189 ........................................................................................................3, 17

N.J.S. 10:5-1 ....................................................................................................................4

**Regulations**

28 C.F.R. § 36.105(d)(1)(v) ..........................................................................................4, 18

28 C.F.R. § 36.309(b)(1)(v) ........................................................................................22, 23

**Legislative History**

Statement of the Managers to Accompany S. 3406, The Americans with Disabilities Act Amendments Act of 2008, 154 Cong. Rec. S8840 (Sept. 16, 2008) .......................................18

U.S. Senate Report 185, 108th Cong., 1st Sess. (Nov. 3, 2003) ......................................13

**Other Authorities**

Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (2013) ..............................13

*The Essentials of WJ-III Tests of Achievement Assessment* at 100 (Mather, Wendling, & Woodcock, 2001) ......................................................................................12

J. Brackett & A. McPherson, "Learning Disabilities Diagnosis in Postsecondary Students: A Comparison of Discrepancy-Based Models," in *Adults with Learning Disabilities: Theoretical and Practical Perspectives* (1996) ...................................13

Pursuant to Fed. R. Civ. P. 65, defendant National Board of Medical Examiners ("NBME") respectfully files this memorandum in opposition to plaintiff Bryan Messenger's motion for a preliminary injunction (ECF No. 2).  For the reasons that follow, the motion should be denied.

## INTRODUCTION

Dr. Messenger attended medical school in the Caribbean islands.  He graduated in April 2017 and hopes to be become licensed to practice in New Jersey.  However, he has not yet been able to pass one of his licensing examinations.  He therefore has decided to sue the entity that administers the examination, in an effort to obtain more testing time than is available to examinees who test under standard time constraints.  The exam in question is the Step 2 Clinical Knowledge exam ("Step 2 CK"), a multiple-choice exam that is one component of the United States Medical Licensing Examination ("USMLE").  Jurisdictions across the country rely upon the USMLE as part of their licensure process for ensuring the qualifications of prospective physicians.

Dr. Messenger asserts that his goal since "he was a young boy" has been to "become a pediatrician" so that he can provide "quality medical care to children."  Complaint ¶¶ 3, 6.  He further asserts that he will be able to achieve that goal only if he receives extra testing time on the Step 2 CK exam.  *Id*. at ¶ 13.  He claims to be legally entitled to extra testing time under the Americans with Disabilities Act ("ADA") because he has been diagnosed with dyslexia.

According to Dr. Messenger, he has difficulty "following … driving directions," "skip[s] steps in recipes and sometimes include[s] wrong ingredients or leave[s] something out," and does not read as well as his first- and third-grade children.  Decl. of Bryan Messenger at ¶ 9 (ECF No. 2-1).  These descriptions are consistent with information he apparently provided during a self-

rating assessment that he completed as part of his effort to receive extra time on the Step 2 CK exam:

> The Self-Rating for Listening/Auditory Processing/Communicating indicates that Bryan hears less well, or is less attentive/productive, in normal-but-busy surroundings; is unusually forgetful of information previously memorized, or of household/school/work routines and responsibilities, despite frequent reminders; has difficulty with phonics; confuses similar-sounding words; is a poor speller who makes errors that are phonetically correct; has problems with speech clarity or articulation, or with grammar, now or in the past; has difficulty reading or writing efficiently; feels the need to ask many extra questions to clarify tasks before starting; often interprets words too literally, becoming confused or suffering hurt feelings; listeners have trouble following [his] train of thought; and he gets the details and facts, but often misses "the big picture" – has a hard time prioritizing or summarizing information.

Report of the Dyslexia Center of Princeton at 14 (Nov. 13, 2015) (included as Ex. B to the Decl. of Lisa P. Kestler, Ph.D.) (ECF No. 2-4 ).  It is difficult to reconcile these characterizations – made to support his request for extra testing time on the Step 2 CK exam – with Dr. Messenger's history of academic success without accommodations.

Dyslexia is a reading disorder with childhood onset.  Dr. Messenger's preliminary injunction papers suggest that he was first diagnosed in elementary school, but he provided different information to NBME when he requested accommodations.  According to his request form, he was first diagnosed with a reading disorder in 2011, when he was 30 years old.  *See* Declaration of Catherine Farmer, Psy.D. ("Farmer Decl.") Ex. D at 4.  He apparently sought the diagnosis because he wanted to receive academic accommodations in medical school.  *See id.*, Ex. A at 46 (Martinelli Report at 1).

Prior to being diagnosed with a reading disorder in 2011, Dr. Messenger took various high-stakes standardized tests without receiving extra testing time.  Although he claims here to

have "the reading comprehension of a fourth-grader,"[1] he took the ACT college admissions test without any accommodations and did well enough to gain admission to college, where he achieved a 3.2 grade point average without accommodations.  He subsequently took the extremely challenging Medical College Admission Test ("MCAT"), testing multiple times without extra testing time, and scoring better on one administration than most other examinees.

More recently, Dr. Messenger has taken – and passed – two of the other USMLE Step exams with no accommodations.  Under standard testing conditions (*i.e.*, no extra testing time), he passed the Step 1 exam in 2014 and the Step 2 CS exam in 2015.  Farmer Decl. ¶¶ 11, 12.

Against this background, Dr. Messenger is seeking a preliminary injunction that would require NBME to grant him double the amount of testing time that is available to individuals who take Step 2 CK under standard conditions.  He is not seeking to maintain the status quo.  Instead, he is seeking a *mandatory* preliminary injunction that would give him all of the substantive relief that he would be entitled to receive if he were to prevail on the merits of his ADA claim.  Because he has not shown any factual or legal basis for such extraordinary relief, his motion should be denied.

## NATURE OF THE CASE

Dr. Messenger claims that he is entitled to extra testing time on the Step 2 CK exam because he has been diagnosed with dyslexia.  Complaint ¶¶ 2, 8.  He bases this claim on (1) a provision in Title III of the Americans with Disabilities Act (the "ADA") that applies specifically to private entities that administer tests used for licensure purposes, *see* 42 U.S.C. § 12189; (2) Section 504 of the Rehabilitation Act, which prohibits discrimination against disabled

---

[1] Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction at 9 (ECF No. 2-9) ("Pl. Mem.").

- 3 -

individuals by entities that receive "federal financial assistance," *see* 29 U.S.C. § 794;[2] and (3) the New Jersey Law Against Discrimination ("NJLAD"), which prohibits discrimination by "places of public accommodation," *see* N.J.S. 10:5-1 *et seq*.  *See* Complaint ¶¶ 12, 44-82.[3]

As relief for NBME's alleged violations of these statutes, Dr. Messenger seeks a permanent injunction requiring NBME "to immediately grant Plaintiff double time for all elements of the United States Medical Licensing [E]xams."  Complaint at p. 13, ¶ b.  He also seeks compensatory damages, punitive damages, attorneys' fees, and costs.  *Id.* at pp. 13-14.

To be entitled to testing accommodations, Dr. Messenger must demonstrate that he is disabled within the meaning of the ADA and needs accommodations to access the Step 2 CK exam.  Insofar as relevant here, an individual is disabled under the ADA if he is substantially limited in his ability to perform one or more major life activities, as compared to most people in the general population.  42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.105(d)(1)(v).

NBME denies that Dr. Messenger has shown that he is disabled within the meaning of the ADA, and denies that he is entitled to accommodations on the Step 2 CK exam.  His own documentation shows that he is not substantially limited in any major life activity as compared to most people in the general population.  The assessment data in the reports of his supporting professionals show consistently average or above-average performance on the activities that

---

[2]  According to Dr. Messenger, NBME receives federal "funds from the U.S. Department of Defense and the U.S. Department of Veterans Affairs."  Complaint at ¶ 18.  To the extent the referenced "funds" came as payments for goods or services procured by the agencies, the payments do not constitute "federal financial assistance" within the meaning of Section 504 and provide no basis for a Section 504 claim against NBME.  *See, e.g., Bowers v. NCAA*, 118 F. Supp. 2d 494, 530-31 (D.N.J. 2000) (dismissing Section 504 claim against ACT that was based on ACT's having contracts with the federal government:  "A simple compensatory contractual relationship with the federal government does not make the contracting party a recipient of federal financial assistance.")

[3]  NBME denies that it is a "place of public accommodation" within the meaning of the NJLAD.

- 4 -

were assessed.  Further, he has taken other highly competitive, timed, standardized tests without accommodations and achieved average or better-than-average scores.

## BACKGROUND

### I.     NBME And The United States Medical Licensing Examination

NBME is a non-profit organization located in Philadelphia.  *See* Farmer Decl. ¶ 3.  In conjunction with the Federation of State Medical Boards, another non-profit entity, NBME sponsors the USMLE program.  *Id.* ¶ 4.  Jurisdictions across the country rely upon the USMLE as part of their process for ensuring the qualifications of prospective physicians.  *Id.* ¶ 5.

The Step exams that make up the USMLE are designed to assess whether an individual has the knowledge and skills deemed necessary for safe and effective patient care.  *See id.* ¶ 4.  Results of the USMLE are reported to state licensing authorities, providing them with a common evaluation system for all applicants.  *See id.* ¶ 5.  Maintaining the integrity of the testing process is thus an important part of protecting public safety and welfare.

**Step 1** of the USMLE assesses whether candidates understand and can apply important science concepts that are basic to the practice of medicine, with special emphasis on principles and mechanisms underlying health, disease, and modes of therapy.  Under standard testing conditions, it is an eight-hour multiple-choice examination.  *See* "Step 1" at www.usmle.org/Step-1.

**Step 2** of the USMLE assesses the ability of examinees to apply medical knowledge, skills, and understanding of clinical science essential for the provision of patient care under supervision, with attention to the basic patient-centered skills that provide the foundation for the safe and competent practice of medicine.  Step 2 has two parts:  a Clinical Knowledge ("CK") exam, which is a nine-hour multiple-choice examination; and a Clinical Skills ("CS") exam, which is an eight-hour examination that simulates doctor-patient encounters.  Dr. Messenger's

complaint relates to the Step 2 CK examination.  *See* "Step 2 CK" at www.usmle.org/Step-2-CK/; www.usmle.org/Step-2-CS.

**Step 3** assesses whether the applicant can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine.  It is primarily a multiple-choice exam taken over two days during a standard administration, with seven hours of testing on day one and nine hours of testing on day two.  *See* "Step 3" at www.usmle.org/Step-3/.

All of the USMLE Step exams are standardized exams.  With limited exceptions, all examinees take the USMLE under the same testing conditions, including standard testing time. The primary exception is for disabled individuals who need accommodations.  *Id.* ¶¶ 7-8.

NBME receives hundreds of accommodation requests each year and conscientiously evaluates each one.  It does so to ensure that "individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the ... examination."  *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004); *see also* Farmer Decl. ¶ 8.[4]

## II.     Dr. Messenger's Request for Accommodations on the USMLE Step 2 CK Exam

Dr. Messenger has taken, and passed, two USMLE Step examinations without testing accommodations.  He took Step 1 in 2014 under standard conditions and passed.  *See* Farmer Decl. ¶ 11.  He did so after submitting an incomplete request for accommodations, which he

---

[4] Many examinees, with no impairments, would like to have additional testing time on the Step exams.  *Cf. Doe v. Nat'l Bd. of Med. Examiners*, 199 F.3d 146, 151 (3d Cir. 1999) ("Some 25% of examinees have reported that they could have benefited from more time on the [USMLE] examination.").

subsequently withdrew.   He took Step 2 CS in 2015 under standard conditions without requesting accommodations and passed.  *See id.* ¶ 12.

Dr. Messenger first took the Step 2 CK exam in September 2015, under standard conditions (he did not request any accommodations on that administration).  He did not receive a passing score.  *See id.* ¶ 13.  Dr. Messenger then submitted a request for accommodations on the Step 2 CK exam in November 2015.  *See id.* ¶ 14.  He requested extra time, checking both the box for 50% extra time and the box for 100% extra time on his request form.  *See id.* and Ex. A at 3 (Request for Testing Accommodations).  Consistent with its normal practice of seeking input from external experts, NBME provided the documentation submitted by Dr. Messenger to Dr. Richard Sparks, an expert in learning disabilities and special education, and sought a written recommendation as to whether the requested accommodations were warranted.  *See id.* ¶¶ 9, 14-15 and Ex. B (Sparks Evaluation).  Based on Dr. Sparks' recommendation and NBME's own review of the file, NBME concluded that Dr. Messenger's documentation did not demonstrate a substantial limitation in a major life activity compared to most people or that additional time is necessary in order for him to access the Step 2 CK exam.   NBME therefore denied Dr. Messenger's request for extra testing time.  *See id.* ¶ 16 and Ex. C.  Dr. Messenger took the exam in May 2015 under standard conditions, and did not achieve a passing score.

Eight months after NBME denied his request for testing accommodations, Dr. Messenger submitted a new request for extra time accommodations on the Step 2 CK exam.  *See id.* ¶ 18. He submitted additional materials in support of his request, and NBME once again sought Dr. Sparks' independent review of the file and a written recommendation on whether accommodations were warranted.  *See id.* ¶¶ 18-19 and Ex. D (Second Sparks Evaluation).  Dr. Sparks again concluded that accommodations were not warranted, noting, among other things,

that Dr. Messenger's academic records suggested that he no longer met criteria to receive special services in the 11th or 12th grades; he "was not provided with accommodations until he entered medical school;" he "scored in the average range on the English (37th percentile) and Reading sections (24th percentile)" of the ACT college admissions test when compared to a "select population" of individuals going on to college; he earned an Associate degree and a Bachelor's degree and had a 3.2 GPA in college; he scored as high as the 55th percentile on the MCAT; and he passed Step 1 and Step 2 CS under standard time conditions.  *See id.,* Ex. E at 2-3.

Based on Dr. Sparks's recommendation and its own independent review of the file, NBME again concluded that accommodations were not warranted.  *See id.* ¶ 20 and Ex. E. NBME notified Dr. Messenger by letter dated December 9, 2016, that he was not approved for extra testing time.  *See id.* ¶ 20 and Ex. F.  Dr. Messenger has not submitted another request for testing accommodations since that time, has not taken Step 2 CK again, and is not currently registered to take the test.

### III.   Dr. Messenger's Academic History and History Taking Other National Standardized Tests

####    A.    Academic History

#####        1.    Primary and Secondary School

Dr. Messenger's record indicates that he had academic issues in primary and secondary school relating to reading and received services for several years under Individual Education Plans, or "IEPs."  *See* Pl. Mem. Ex. D-F; Farmer Decl. Ex. D at 27-73.[5]  He also scored in the

---

[5]  IEPs are prepared pursuant to the Individuals with Disabilities Education Act ("IDEA"), a federal law that is intended to ensure that children with disabilities receive a free appropriate public education to meet their unique needs and prepare them for further education, employment, and independent living.  As courts have noted, "the ADA and IDEA set forth distinct legal standards in their definitions of 'disability,' such that an individual will not qualify for the ADA's protections simply by virtue of his or her disabled status under the IDEA."  *B.C. v. Mt. Vernon School Dist.*, 837 F.3d 152, 160 (2d Cir. 2016).  "[O]ne may . . . qualify as 'disabled'

below-average range on the Stanford Achievement Test in fifth grade.  *See* Farmer Decl. Ex. D
at 18.  However, it appears that he was never formally diagnosed with a reading disorder during
this time.  *See* Farmer Decl. Ex. D at 4 (Dr. Messenger's USMLE accommodation request form,
identifying 2011 as the year he was first diagnosed with a reading disorder); *see also id.* at 53-56,
67, 69, 72 (IEP forms stating that the Goals and Objectives reflected in the form were based on
"Informal Assessment"); Ex. A at 46 (Report by Dr. Edward Martinelli, stating that Dr.
Messenger reported that he was "placed in resource classes for reading problems from 2nd grade
to 10th grade," but he "could not remember being testing for learning difficulties").  The earliest
formal diagnosis of a reading disorder reflected in the record is from 2011 (discussed below).

Nothing in Dr. Messenger's IEPs indicates that he received classroom accommodations
for whatever reading or behavior difficulties were identified in the IEPs.  For example, the IEPs
did not recommend that Dr. Messenger receive extra time on his classroom or standardized tests.
There are no report cards in the record to indicate his actual classroom performance in
elementary or middle school.

By the time he was in the 12th grade, Dr. Messenger was found <u>not</u> to have a learning
disability as defined in the IDEA.  *See* Farmer Decl. Ex. D at 38.  According to his high school
transcript, Dr. Messenger was primarily an A/B student.  *See id.,* Ex. D at 12.  His overall high
school GPA was 3.4, and he was ranked 191 out of 464 students.  *See id.*  He took some honors
classes while in high school.  *See id.*  There is nothing in the record to suggest that he received
any classroom accommodations in high school.

Dr. Messenger took the ACT college admissions test twice in high school under standard
testing conditions.  Despite his having had IEPs during some of his prior educational years, there

---

under the IDEA … without demonstrating a 'substantially limit[ing]' impairment" within the
meaning of the ADA.  *Id.*

is no suggestion in the record that he requested extra testing time or other accommodations on the ACT exam.  When he took the exam in the spring of his junior year (April 1999), his Composite score was at the 25th percentile.  *See* Farmer Decl. Ex. D at 9.  When he took the test again during his senior year (December 1999), his Composite score improved to the 48th percentile, and he scored in the 37th percentile on the English section and 24th percentile on the Reading section.  *See id.*  Those scores put him in the "average" range for all college-bound examinees who tested when he did.  *See* Farmer Decl. Ex. E at 3 (Second Sparks Report).

2.      **College**

Dr. Messenger initially attended Utah Valley University, where he earned an associate in science degree.  *See* Farmer Decl. Ex. A at 43-44.  He then attended the University of Utah, where he was primarily an A/B student and graduated with a GPA of 3.2.  *See id*., Ex. A at 40-41.  He did not receive accommodations in college.  *See id.,* Ex. A at 46 (Martinelli Report at 1) (stating that Dr. Messenger reported a "college GPA of 3.2" and "did not receive services in college"); Ex. D at 5 (Request for Testing Accommodations) (identifying medical school as the only post-secondary institution where he had received accommodations).

The Medical College Admission Test (MCAT) is a rigorous test taken by college students or graduates interested in applying to medical school.  Dr. Messenger took the MCAT four times between 2007 and 2010, all under standard time conditions.  *See* Farmer Decl. Ex. A at 38.  His total score ranged from the 43rd to the 55th percentile in these four administrations, meaning he scored higher than approximately ½ of the highly select group of individuals who take this test.  *See id.*  His scores were strong enough to earn him admission to medical school.

There are no transcripts or other medical school records before the Court that show how Dr. Messenger performed in medical school.

## IV.    Dr. Messenger's Claimed Impairment

Dr. Messenger relies upon two evaluations reports to support his claim for extra testing time on the Step 2 CK exam.  The first evaluation was performed in 2011 by Dr. Edward Martinelli, a psychologist in Utah.  *See* Farmer Decl. Ex. A at 46.  Dr. Messenger obtained that evaluation shortly before starting medical school, apparently to support a request for accommodations from the medical school.  *See id.* Ex A at 46, 53 (Report at 1, 8) ("It is initially recommended that Bryan meet with campus disabilities officials in order to discuss the results of this assessment and to set up potential appropriate accommodations.").  The second evaluation was done in November 2015 by Dr. Lisa Kestler, a psychologist in New Jersey.  *See id.*, Ex. A at 11.  According to Dr. Kestler's report, Dr. Messenger sought this evaluation "to document a history of specific learning disability in reading, so that he can apply for accommodations on the United States Medical Licensing Examination."  *Id.*, Ex. A at 23 (Report at 13).

### A.    Dr. Martinelli's Evaluation

Dr. Martinelli diagnosed Dr. Messenger with a Reading Disorder.  Farmer Decl. Ex. A at 53 (Report at 8).  He included a "Caveat" in his summary, however, stating that the "[r]esults of psychological testing should always be regarded with caution," and that "the results of this assessment should not be considered valid into the indefinite future, especially beyond one year."  *Id.*, Ex. A at 47 (Report at 2).

Dr. Martinelli administered various assessments to Dr. Messenger as part of his evaluation, including the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) and the Woodcock-Johnson III Tests of Achievement (WJ-III).  *Id.*, Ex. A at 47 (Report at 2-7).  The results from the WAIS-IV were as follow:

| | |
|---|---|
| Verbal Comprehension: | **Superior** |
| Perceptual Reasoning: | **Very Superior** |
| Working Memory: | **High Average** |
| Processing Speed: | **Average** |
| Full Scale IQ (FSIQ): | **Superior** |
| General Ability Index (GAI): | **Very Superior** |

*Id*, Ex. A at 47-48 (Report at 2-3).[6]

Dr. Martinelli reported the results from the WJ-III with respect to both age-based and grade-based norms.[7]   Using age-based norms, Dr. Messenger's performance on the 12 reported WJ-III clusters – which included broad and basic reading skills and academic fluency – ranged from a low of "Average" to a high of "Superior."   *Id*., Ex. A at 50 (Report at 5).   The grade-based norms produced a single classification of "Low" (for academic fluency), while the remaining 11 clusters resulted in "High Average," "Average," or "Low Average" scores.   *Id*.

Based upon the results from the WAIS_IV and WJ-III, Dr. Martinelli concluded that Dr. Messenger's "cognitive ability scores were well developed," with "processing speed … in the average range," most of his scores in the High Average and Superior range, [and] some scores in the Very Superior Range."   *Id.,* Ex. A at 52 (Report at 7).   His "achievement scores, however, were more in the average to high average range with his reading scores in the low end of average range compared to his same-age peers."   *Id.*

---

[6]  The declaration submitted by Dr. Kestler in support of Dr. Messenger's pending motion characterizes the WAIS-IV as the "gold standard in intelligence testing."   Kestler Decl. at ¶ 10.a (ECF No. 2-2).

[7]  According to a leading reference manual on the WJ-III, when an achievement test provides both grade- and age-based norms for interpreting test results, grade-based norms should be used within a school setting, and age-based norms should be used in a clinical setting and with adults. *See The Essentials of WJ-III Tests of Achievement Assessment* at 100 (Mather, Wendling, & Woodcock, 2001).   Dr. Messenger was evaluated in a clinical setting, as an adult.

According to Dr. Martinelli, there are "two ways of looking at Bryan's scores to discern whether there is a specific learning disability present." *Id.* One of those ways "is through the discrepancy model, where substantial differences between one's cognitive abilities and achievement scores demonstrate significant learning issues." *Id.* Dr. Martinelli concluded that Dr. Messenger has a learning disability under the discrepancy model. *Id.* The other way of looking at Dr. Messenger's scores, said Dr. Martinelli, is "through an average-person model," where "achievement scores must fall below the average range to demonstrate a learning difficulty." *Id.* Dr. Martinelli concluded that Dr. Messenger came "close" to meeting "criteria for an average-person model." *Id.*

Dr. Martinelli apparently chose to apply the discrepancy model,[8] and diagnosed Dr. Messenger with a Reading Disorder (DSM-IV diagnostic code 315.00). *Id.* at 53 (Report at 8).[9]

### B.   Dr. Kestler's Re-Evaluation

Dr. Messenger received an updated psychological assessment from Dr. Lisa Kestler in late 2015. According to Dr. Kestler, her evaluation "support[ed] a diagnosis of Dyslexia, or

---

[8]  The discrepancy model for diagnosing learning disabilities has been largely discredited, including by the federal government. *See, e.g.,* U.S. Senate Report 185, 108th Cong., 1st Sess. (Nov. 3, 2003) (stating, in the context of amendments to the IDEA, that "[t]here is no evidence that the IQ-achievement discrepancy formula can be applied in a consistent and educationally meaningful (*i.e.*, reliable and valid) manner"). Nevertheless, it remains widely used. According to one study, "an "astute diagnostician can qualify between 50% and 80% of a random sample of the population as having a learning disability" by using discrepancy-based diagnostic models. *See* J. Brackett & A. McPherson, "Learning Disabilities Diagnosis in Postsecondary Students: A Comparison of Discrepancy-Based Models," in *Adults with Learning Disabilities: Theoretical and Practical Perspectives*, at 70 (1996).

[9]  "DSM-IV" was the then-current edition of the *Diagnostic and Statistical Manual of Mental Disorders,* published by the American Psychiatric Association. The current edition is DSM-5. A "Cautionary Statement" in DSM-5 notes that, in "most situations, the clinical diagnosis of a DSM-5 mental disorder … does not imply that an individual … meets … a specified legal standard (*e.g*., for … disability). For the latter, additional information is usually required," such as "information about the individual's functional impairments and how these impairments affect the particular abilities in question." DSM-5 at 25 (2013).

Reading Disorder," but she did not assign a specific diagnostic code in her report. *See* Farmer Decl. Ex. A at 26 (Report at 16). She did note, however, that the "term Dyslexia is often used synonymously with the formal DSM-5 classification of Reading Disorder, and is included in the DSM-5 as an alternate diagnostic label." *Id.*

Dr. Kestler administered several assessments to Dr. Messenger as part of her evaluation. Like Dr. Martinelli, she administered the WAIS-IV, which yielded the following results:

| | |
|---|---|
| Verbal Comprehension: | **Superior** |
| Perceptual Reasoning: | **Superior** |
| Working Memory: | **Superior** |
| Processing Speed: | **Average** |
| Full Scale IQ (FSIQ): | **Superior** |
| General Ability Index (GAI): | **Very Superior** |

*Id.*, Ex. A at 14 (Kestler Report at 4).

She also administered the Wechsler Individual Achievement Test–Third Edition (WIAT-III), on which Dr. Messenger's Total Achievement Composite Score "was in the Average range, in the 68th percentile compared to same-age peers;" his performance on math tasks was "Above Average, in the 97th percentile;" and his "performance on all other tests, including Oral Language skills, Reading, Written Expression, and Math Fluency, were in the Average range." *Id.*, Ex. A at 17 (Report at 7).

On the Beery-Buketnica Development Test of Visual-Motor Integration, which assesses how well an individual coordinates visual and motor abilities, Dr. Messenger "scored in the average range at the 58th percentile" on the VMI subtest, and in the 30th percentile on the Visual Perception subtest, which was "still within the average range." *Id.*, Ex. A at 19 (Report at 9).

On the Test of Information Processing Skills, which "provides a measure of skills related to acquiring, storing, and processing information," his scores were all average or above average, ranging from the 37th percentile to the 91st percentile. *Id.*, Ex. A at 20 (Report at 10). [10]

Dr. Kestler summarized her results as follows:  (1) "Bryan's performance on tests of academic achievement was in the Average range compared to same-age peers;" (2) "Bryan's Mathematics skills were well Above Average;" (3) "he demonstrated strong Oral Language skills;" (4) his "performance on tests of Reading, written Expression, and Reading Comprehension and Fluency were all in the Average Range;" and (5) his "spelling, sentence composition, and grammar and mechanics in composing essays" were "all at the low end of the Average range." *Id.*, Ex. A at 26 (Report at 16).  In other words, she found that he performed in the average range or better in all of the referenced areas.

Dr. Kestler concluded that the results of her evaluation "support diagnoses of Reading Disorder and Disorder of Written Expression." *Id.*  She appears to have applied a discrepancy model in reaching this conclusion.  *See* Kestler Decl. at ¶ 15.

Dr. Kestler's report does not address how well Dr. Messenger reads, learns, writes or takes tests as compared to most people in the general population.  Neither does the declaration that she has submitted on Dr. Messenger's behalf.

---

[10] Dr. Kestler also administered the Gray Oral Reading Test – Fifth Edition (GORT-5) to Dr. Messenger.  Her report provides his scores from the GORT-5 but she does not summarize the significance of those scores.  *See id.*, Ex. A at 16 (Report at 6).

**ARGUMENT**

## I.     PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an "extraordinary" remedy that should not be granted unless a plaintiff shows that the four prerequisite factors all support the requested relief.  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008); *see also, e.g., Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *Petit-Clair v. State of New Jersey*, 2015 U.S. Dist. LEXIS 101624, at *18 (D.N.J. 2015) ("A preliminary injunction is an extraordinary remedy that is not routinely granted.") (citation omitted).  A plaintiff must make a "clear showing" that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.  *Winter*, 555 U.S. at 20, 22.  If a plaintiff fails to satisfy any one of the *Winter* factors, the preliminary injunction must be denied.  *See id.* at 22.

The burden on Dr. Messenger is even higher here, because he seeks a mandatory preliminary injunction that would alter the status quo and award him all of the substantive relief to which he would he would be entitled if he were to prevail in this lawsuit.  "[W]here the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction."  *Bennington Foods LLC v. St. Croix Renaissance Group, LLP*, 528 F.3d 176, 179 (3d Cir 2008) (citation omitted).

## II.     DR. MESSENGER IS NOT LIKELY TO SUCCEED ON THE MERITS

Dr. Messenger has not satisfied the demanding standard for issuance of a mandatory preliminary injunction.  At the outset, Dr. Messenger has not made a clear showing that he is likely to succeed on the merits, because has not shown that his ability to read or learn is substantially limited compared to most people in the general population.

**A.**   **Disability Under The ADA:  Substantial Limitation in a Major Life Activity Compared to Most People in the General Population.**

NBME is subject to a specific provision of Title III of the ADA, 42 U.S.C. § 12189, which provides in relevant part as follows:

> Any person that offers examinations or courses relating to applications, licensing, certifications, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative arrangements for such individuals.

42 U.S.C. § 12189.   Thus, the ADA requires NBME to offer the USMLE in a place and manner that is accessible to individuals with disabilities.

An individual is disabled within the meaning of the ADA if he or she has "a physical or mental impairment that substantially limits one or more major life activities . . . ."  42 U.S.C. § 12102(1)(A).  In the ADA Amendments Act of 2008 ("ADAAA"), Congress emphasized that the statute should be construed to provide "broad coverage."  *Id*. at § 12102(4)(A).  Nevertheless, an individual seeking disability-based accommodations must still show that he is, in fact, disabled within the meaning of the statute.  *See id*. at § 12102(4)(A); *see also, e.g., Neely v. PSEG Texas, LP*, 735 F.3d 242, 245 (5th Cir. 2013) ("Although the … ADAAA … broaden[ed] the definition and coverage of the term 'disability,' it in no way eliminated the term from the ADA or the need to prove a disability on a claim of disability discrimination.").

Under the ADAAA, as under the ADA, having a diagnosed impairment is not the same thing as having a covered disability with the meaning of the statute:

> By retaining the essential elements of the definition of disability including the key term 'substantially limits' we reaffirm that not every individual with a physical or mental impairment is covered by the . . . definition of disability in the ADA.  An impairment that does not substantially limit a major life activity is not a disability under [the first prong of the definition].  That will not change after enactment of the ADA Amendments Act, nor will the necessity of making this determination on an individual basis. . . .

Statement of the Managers to Accompany S. 3406, The Americans with Disabilities Act Amendments Act of 2008, 154 Cong. Rec. S8840, S8841-42 (Sept. 16, 2008).  This is reiterated in the regulations that implement Title III of the ADA:  "An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity ***as compared to most people in the general population***.  An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity to be considered substantially limiting.  Nonetheless, ***not every impairment will constitute a disability*** . . . ."  28 C.F.R. § 36.105(d)(1)(v) (emphases added).

Thus, to be entitled to accommodations on the Step 2 CK exam, Dr. Messenger must show that, as a result of his diagnosed impairment, he is substantially limited in his ability to perform a major life activity that is relevant to taking a multiple-choice standardized test, as compared to most people in the general population.  *Cf. Alston v. Park Pleasant, Inc.,* 2017 U.S. App. LEXIS 2668, *5-8 (3d Cir. 2017) (affirming summary judgment for defendant in a post-ADAAA case where, although diagnosed with cancer, plaintiff did not allege substantial limitation in any relevant major life activities); *Mann v. Louisiana High Sch. Athletic Assoc.*, 535 Fed. Appx. 405, 410 (5th Cir. 2013) ("Although the ADA Amendments Act of 2008 lowered the standard that plaintiffs must meet to show that they are disabled, . . . a plaintiff must still show substantial limitation....") (reversing grant of preliminary injunction because diagnosis of anxiety disorder, standing alone, was insufficient to show disability under the ADAAA). [11]

---

[11]  Dr. Messenger states in his brief that the "ADA and Rehabilitation Act contain analogous requirements," and that the NJLAD is interpreted in a manner consistent with the federal statutes. Pl. Mem. at 7 n.3.  He therefore focuses his preliminary injunction arguments "on the ADA." *Id.* For similar reasons – and because Dr. Messenger has no claims under the Rehabilitation Act or the NJLAD, *see* nn. 2 and 3 *supra* -- NBME does likewise in this response.

**B.**     **Dr. Messenger is Not Likely to Succeed in Showing That He is Disabled Within the Meaning of the ADA.**

Dr. Messenger claims that he is disabled within the meaning of the ADA based upon his having received a diagnosis that he suffers from dyslexia.  As discussed above, to show that he is disabled within the meaning of the ADA, Dr. Messenger must prove that he has a "physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  The records that Dr. Messenger submitted to NBME and that he relies upon in support of his motion for mandatory preliminary relief do not show that he is likely to succeed on the merits of this argument.  Indeed, his own records affirmatively demonstrate that Dr. Messenger is *not* disabled within the meaning of the ADA.

First, there is a question whether Dr. Messenger suffers from a physical or mental impairment.  Although Dr. Messenger has been diagnosed with dyslexia, the evidence does not support the diagnosis of a reading disorder.  He may have experienced some early difficulties with reading, but the objective evidence demonstrates that he has been able to learn and achieve at a level commensurate with, or above, most people in the general population.  There is no objective evidence that Dr. Messenger was impaired to the level of warranting a clinical diagnosis, or that he ever received such a formal diagnosis, during childhood, adolescence, or high school.   Likewise, in his 2011 and 2015 clinical evaluations, he performed in the average range or better on timed, standardized measures of reading.  *See* Farmer Decl. Ex. B at 3-6.  As NBME's expert consultant explains, there are numerous issues with the diagnostic conclusions made by Dr. Martinelli (who evaluated Dr. Messenger in 2011) and Dr. Kestler (who evaluated Dr. Messenger in 2015).  *See id.*

Second, even if one accepts Dr. Messenger's diagnoses at face value, merely having a diagnosed impairment is not enough to show that he is disabled within the meaning of the ADA.

*See, e.g., Rawdin v. Amer. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 649 (E.D. Pa. 2013) ("[T]he changes reflected in the ADAAA were not intended to make 'every impairment . . . a disability within the meaning of this section.'")(citations omitted), *aff'd on other grounds*, 582 Fed. Appx. 114 (3rd Cir. 2014).   Instead, "[t]he relevant inquiry remains whether the impairment 'substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.'"   985 F. Supp. 2d at 649 (citation omitted).   While Dr. Messenger may not perform as well as he would like, or as well as his medical school peers, that is not the relevant inquiry under the ADA.   Dr. Messenger's impairment must be measured against most people in the general population, not other college graduates or medical students, and not compared to his own actual or perceived intellectual potential.   *See Singh v. George Washington Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007) (explaining that the relevant comparison is to the average person in the general population, not to other individuals attending medical school); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 U.S. Dist. LEXIS 48181, at *25 (E.D. Pa. 2016) ("It is inappropriate under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, other test-takers who are not representative of the general population") (holding, in a directly analogous case, that plaintiff was not disabled within the meaning of the ADA notwithstanding her diagnosed dyslexia, and therefore was not entitled to extra testing time on a medical licensing exam).

Dr. Messenger argues he "can readily establish that he is an individual with a disability because dyslexia significantly limits the ability to read, learn, concentrate, think, and process information, as shown by the basis of extensive testing demonstrating that even though he graduated from medical school, he has the reading comprehension of a fourth-grader."   Pl. Mem. at 9.   The record evidence, however, does not establish that Dr. Messenger has any impairment

that substantially limits him in any of these respects, particularly when compared to most people in the general population.  He has progressed successfully through high school, college, and medical school, with no academic accommodations until medical school.

Even more telling, Dr. Messenger has performed in the average range on timed, standardized tests without receiving extra time or other accommodations.  He obtained composite ACT scores in the 25th and 48th percentiles and composite MCAT scores that ranged from the 43rd to 55th percentiles under standard testing conditions.  *See* Farmer Decl. Ex. A at 38 (MCAT score report) and Ex. D at 9-10 (ACT score reports).  The MCAT score is particularly informative, as his performance is being measured against a select group of individuals—college students and graduates who are interested in attending medical school.  He also passed Step 1 and Step 2 CS of the USMLE without accommodations.  Individuals who perform at that level without any accommodations do not have a reading disorder that rises to the level of a disability under the ADA.  *See, e.g., Bibber,* 2016 U.S. Dist. LEXIS 48181, at *25 (individual who scored in the "average" range on the GRE (a graduate school admission test) and MCAT exams without accommodations was not substantially limited compared to most people in reading); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 621 (S.D. Ind. 2012) ("Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, . . . stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population."); *Love v. Law School Admission Council*, 513 F. Supp. 2d 206, 214 (E.D. Pa. 2007) (holding that plaintiff had not shown that he was disabled under the ADA and denying testing accommodations, where plaintiff achieved ACT and SAT scores "within the average range" with no accommodations, had a 3.16 high school GPA, and did well in college without accommodations).

Citing 28 C.F.R. § 36.309(b)(1)(v), Dr. Messenger argues that NBME improperly "ignored" the "extensive documentation of [his] disability" and evidence of his accommodations at St. George's Medical School.  *See* Pl. Mem. at 9.  Dr. Messenger, however, misstates the record.  Contrary to his argument, *see id.*, there is no documentation of a dyslexia diagnosis dating back to second grade.  Dr. Messenger was not diagnosed until 2011, when he was 30 years old and attempting to receive accommodations in medical school.  Although he received certain support services in primary and secondary school, he has produced no clinical evaluation that would show he was diagnosed with dyslexia at an earlier age.  Indeed, in his request to NBME, he states that he was first diagnosed in 2011, and he informed his evaluator in 2011 that "he could not remember being tested for learning difficulties[.]"  *See* Farmer Decl. Ex. A at 46 (Martinelli Report at 1) and Ex. D at 4 (Request for Testing Accommodations).  He did not receive any accommodations in high school or college; he first receive accommodations in medical school.

Dr. Messenger also mistakenly argues that NBME "ignored" the documentation he did submit.  NBME carefully considers all the evidence it is provided in determining whether to approve a request for testing accommodations, and did so here, including obtaining the recommendation of an independent expert in learning disabilities and special education.  *See* Farmer Decl. ¶¶ 8, 14-16, 18-20 and Exs. B, C, E, and F.  NBME is not required, however, to approve any particular accommodation simply because it was previously provided.  Receiving accommodations in an academic context is very different from receiving accommodations on a standardized test, and it was entirely appropriate for NBME to conduct its own assessment of Dr. Messenger's documentation and determine whether he is entitled to accommodations on the USMLE.  *Cf. Ware v. Wyoming Bd. of Law Exam'rs*, 973 F. Supp. 1339, 1357 (D. Wyo. 1997)

("Although information regarding past accommodations may be helpful..., the fact that a person has been granted a particular accommodation in the past does not mean that such accommodations are presumptively reasonable.  Each testing agency has an independent duty under the ADA to determine reasonableness on a case-by-case basis."), *aff'd mem.*, 161 F.3d 19 (10th Cir. 1998).  Indeed, the more relevant accommodation history for Dr. Messenger is the fact that he has ***never*** been accommodated on a national standardized test yet has performed at least in the average range on such tests.  Moreover, the implementing regulation referenced by Dr. Messenger requires that "considerable weight" be given to documentation of past accommodations "received in similar testing situations[,]" 28 C.F.R. § 36.309(b)(1)(v), and Dr. Messenger has never been accommodated on a timed standardized test like the USMLE Step 2 CK.  To the contrary, he took the Step 1 exam, the ACT exam (twice), and the MCAT (multiple times) under standard time conditions.

Dr. Messenger claims that he has difficulty reading books to his elementary-school aged children, that his first- and third-grade children read better than he does, and that his reading skills are so impaired that he has trouble using grocery store lists and following recipes.  *See* Pl. Decl. at 9.  These subjective perceptions of his abilities, however, are belied by the objective evidence in the record regarding his academic achievements to date.  An individual who can read no better than a first grader would not have graduated from college without accommodations or scored better than 54% of the individuals taking the Medical College Admission Test.

Before and after the amendments to the ADA, courts have looked to objective evidence of individuals' actual performance on other standardized tests and/or in academic or other environments in determining whether they are substantially limited in major life activities such as learning or reading (or any other activities implicated with respect to taking standardized

tests).  *See, e.g., Bibber*, 2016 U.S. Dist. LEXIS 48181, at *19-20 (explaining courts have considered numerous factors, including "objective test results," "any pattern of substantial academic difficulties," and "whether the individual has been afforded testing accommodations in the past"); *Healy*, 870 F. Supp. 2d at 620-21 ("[C]ourts have considered the plaintiff's objective test results as compared to the average person, . . . the plaintiff's other activities, including extracurriculars, . . . whether there exists a pattern of substantial academic difficulties, ... and whether the plaintiff has been afforded testing accommodations in the past ....") (citations omitted); *see also, e.g., Palotai v. Univ. of Maryland*, 38 Fed. Appx. 946, 955 (4th Cir. 2002) (noting that plaintiff's psychologist did not compare his ability to learn with that of an average person in the general population and finding "[t]his deficiency is particularly crucial in  a case like this one in which the person claiming a significant limitation on his ability to learn has a demonstrated record of academic achievement...."); *Bercovitch v. Baldwin Sch.*, 133 F.3d 141, 155 (1st Cir. 1998) ("[Plaintiff] never experienced significant academic difficulties, and in fact has excelled academically for most of his years at the Baldwin School."); *Bach v. Law School Admission Council*, 2014 U.S. Dist. LEXIS 124632, *5 (M.D.N.C. 2014); *Rumbin v. Ass'n of American Med. Colleges*, 803 F. Supp. 2d 83, 95 (D. Ct. 2011) ("Mr. Rumbin's … prior education and test-taking without accommodations, demonstrate that he is not substantially limited in the major life activities of seeing, learning, and reading."); *Love v. Law School Admission Council*, 513 F. Supp. 2d at 228 ("Given all the evidence presented, including Plaintiff's test scores, clinical evaluations, educational history, and his reported ability to function in both academic and professional environments, we are not persuaded that Plaintiff has a disability as defined under the ADA.").

As Dr. Sparks noted, "[a]lthough Bryan may have had early difficulties with reading, his skills obviously had improved to the extent that he could achieve at a level with, or above, his same age peers in the general population in his undergraduate education and, at minimum, in the average range on timed, standardized tests when compared to select populations."  Farmer Decl. Ex. E at 3.  His academic success, his performance on other standardized tests, and the findings of his own supporting professionals confirm that Dr. Messenger is not substantially limited in any major life activity as compared to most people in the general population.  Instead, as in *Bibber*, his "reading and processing abilities are average compared to the general population." *See* 2016 U.S. Dist. LEXIS 48181, at *23.  "'By definition, 'average' is not 'substantially limited.'"  *Rawdin*, 985 F. Supp. 2d at 652 (citation omitted).

## III.   DR. MESSENGER HAS NOT MADE A CLEAR SHOWING THAT HE IS LIKELY TO SUFFER IRREPARABLE HARM

In addition to failing to show a likelihood of success on the merits, Dr. Messenger also fails to make a clear showing that he is likely to suffer irreparable harm in the absence of mandatory preliminary injunctive relief.

Dr. Messenger argues that irreparable harm should be presumed when there is a violation of the ADA.  *See* Pl. Br. at 10.  There has been no showing of any violation of the ADA, however, and "no case law has been found to support the idea that merely ***alleging*** violations of the ADA and Rehab Act, without more, establishes irreparable injury."  *Lincoln CERCPAC v. Health & Hospitals Corp.*, 920 F. Supp. 488, 495-96 (S.D.N.Y. 1996) (emphasis added).[12]

---

[12] In *Cupolo v. Bay Area Rapid Transit*, a case cited by Dr. Messenger, the plaintiffs "established a strong factual record that class members have been, and probably will continue to be, denied adequate access to the BART system because of malfunctioning elevators."  5 F. Supp. 2d at 1084.  Dr. Messenger, in contrast, has not shown any denial of access by the NBME.  In *Burriola v. Greater Toledo YMCA*, another case cited by Dr. Messenger, the dispute involved a child's placement in day care, which is likewise not analogous to the facts presented here.  *See* 133 F. Supp. 2d at 1040.

A delay in taking a professional examination does not constitute irreparable harm.  *See Cox v. City of Chicago*, 868 F.2d 217, 223 (7th Cir. 1989) (no irreparable harm if plaintiffs could not take an exam on a particular date, because they could take the test later if they prevailed on their claim); *Mahmood v. Nat'l Bd. of Med. Examiners*, 2012 U.S. Dist. LEXIS 86837, at \*15 (E.D. Pa. 2012) ("delays in testing or educational services do not constitute irreparable harm"); *O'Brien v. Virginia Bd. of Bar Examiners*, 1998 U.S. Dist. LEXIS 4344, at \*5-6 (E.D. Va. 1998) (no irreparable harm if plaintiff had to wait to take the bar exam).  Although Dr. Messenger complains that further delay is making it less likely that he will obtain a pediatric residency, he provides no support for this prediction.  Such speculative argument cannot establish irreparable harm.  *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000) ("the risk of irreparable harm must not be speculative") (citations omitted).

In any event, to the extent that Dr. Messenger alleges he is being injured due to delay, it is a delay of his own creation.  Dr. Messenger's request for testing accommodations on Step 2 CK of the USMLE was denied well over a year ago, in March 2016.  *See* Messenger Decl. ¶ 16. He tested without accommodations in May 2016, and did not pass the test.  *See id.* ¶ 17.  He then waited six months before seeking reconsideration of NBME's denial of his request for testing accommodations.  After being informed in early December 2016 that his request was denied,  *see id.* ¶¶ 18-19, Dr. Messenger then waited again—almost six months—before bringing this action. He has not attempted to test again since May 2016.  "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiff's rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action."  *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (3d Cir. 1985) (citations omitted); *see also Chaves v. Int'l Boxing Fed'n*, 2016 U.S. Dist. LEXIS

37158, *4 (D.N.J. 2016) ("'[D]elay … knocks the bottom out of any claim of immediate and irreparable harm.") (citations omitted).

The claimed urgency that Dr. Messenger relies upon to show a risk of irreparable harm cannot reasonably be attributed to NBME; it is attributable to Dr. Messenger's decision not to seek relief expeditiously.[13]   In this context, there can be no viable assertion of irreparable harm. *See Baer v. NBME*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) ("If Baer believed her lifelong dream of becoming a doctor was about to come to an end, as she alleges in her verified complaint, then perhaps her pursuit of a judicial remedy should have been more expeditious. Her slowness in filing this action after receiving the NBME's denial letter is unexplained, and any consequent time binds she faces are self-inflicted.") (finding no irreparable injury and denying request for preliminary injunction) (citations omitted); *Pazer v. N.Y. Bd. of Law Examiners*, 849 F. Supp. 284, 287 (S.D.N.Y. 1994) ("[A]ny so-called irreparable injury here is largely the result of Pazer's decision not to seek judicial relief sooner.").  Dr. Messenger has not shown irreparable harm that would entitle him to mandatory preliminary relief on an emergency basis.

## IV.    ANY CLAIMED HARM TO DR. MESSENGER DOES NOT OUTWEIGH THE HARM TO NBME IF AN INJUNCTION ISSUES

Dr. Messenger claims that NBME will not suffer any harm if it grants him double time on the Step 2 CK exam, because it purportedly "routinely grants double-time on examinations."  Pl. Mem. at 11.  While NBME does not "routinely" grant double time as an accommodation, it does

---

[13]  The purported basis for expedited review of Dr. Messenger's preliminary injunction motion is unclear.  Dr. Messenger argues in his brief that he is moving for preliminary relief "so that he can take the test with accommodations by **July 15, 2017**, in time for him to submit a competitive application for summer 2018 residency programs."  Pl. Br. at 2 (emphasis added).  In his supporting declaration, however, he states that "[f]ailure to pass the USMLE Step 2 CK by **September 15, 2017** will prevent me from competitively applying for 2018 residency programs."  Decl. of Plaintiff Bryan Messenger ("Messenger Decl.") ¶ 25 (emphasis added).  Likewise, in his Complaint, Dr. Messenger argues that he needs to pass the USMLE Step 2 CK by September 15, 2017, not July 15.  *See* Complaint ¶ 35.

provide extra testing time to individuals who demonstrate that they are disabled under the ADA and need extra time.  *See* Farmer Decl. ¶¶ 7, 8.  But NBME denies accommodations when the applicant has not established the existence of an impairment that rises to the level of a disability as defined by the ADA.  *See id.*   NBME does so to ensure that its testing program is fair to all examinees, and to protect the comparability and validity of USMLE scores.  *Id.; see also Powell v. NBME,* 364 F.3d at 88-89.  Because of those concerns, the potential harm to NBME outweighs any claimed harm to Dr. Messenger from not being able to test with accommodations this July.

## V.     AN INJUNCTION DOES NOT SERVE THE PUBLIC INTEREST

Dr. Messenger argues that the public interest would be served by granting him a preliminary injunction because it will further the purpose of the ADA.  *See* Pl. Mem. at 12.  This argument assumes—incorrectly—that Dr. Messenger has demonstrated that he is, in fact, disabled within the meaning of the ADA and entitled to his requested accommodations.

Broader interests must also be considered when evaluating the public interest in this context.  "Although the public certainly has an interest in the enforcement of the ADA, ... the public also has an interest in the fair administration of standardized tests."  *Bach,* 2014 U.S. Dist. LEXIS 124632, *7-8 (finding that the public interest did not weigh in favor of either party); *Mahmood,* 2012 U.S. Dist. LEXIS 86837, at *16 ("NBME has a countervailing public interest in keeping its testing services professional and reliable").  Other candidates do not want extra testing time to be granted to individuals who are not disabled, as that could provide an advantage that is denied to other test takers.  Nor do score users want unwarranted accommodations to be provided, because such accommodations can affect the comparability of the resulting test scores.  Factoring these other interests into the mix, the public interest supports not awarding accommodations by way of a preliminary injunction when the record shows that such accommodations are neither needed nor warranted.

## CONCLUSION

Dr. Messenger's motion for preliminary injunction should be denied.

Dated:  June 5, 2017                              Respectfully submitted,


                                                  /s/ Felice Galant
                                                  _____
                                                  Felice Galant
                                                  Norton Rose Fulbright US LLP
                                                  1301 Avenue of the Americas
                                                  New York, NY 10019-6022
                                                  Telephone:  (212) 318-3000
                                                  Facsimile:  (212) 318-3400
                                                  felice.galant@nortonrosefulbright.com


                                                  Robert A. Burgoyne
                                                     (*pro hac* application forthcoming)
                                                  Caroline M. Mew
                                                     (*pro hac* application forthcoming)
                                                  Norton Rose Fulbright US LLP
                                                  799 9th Street, NW, Suite 1000
                                                  Washington, D.C.  20001
                                                  Telephone:  (202) 662-0200
                                                  Facsimile:  (202) 662-4643


                                                  Counsel for Defendant NBME

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Opposition to Plaintiff's Motion for Preliminary Injunction was served on counsel for plaintiff through the Court's CM/ECF system on June 5, 2017.

<u>/s/ Felice Galant</u>